IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **DIANE BLANN,** | ) |
| | ) |
| Judgment Creditor, | ) |
| | ) |
| v. | ) |
| | ) |
| **OPAL EVELYN ROGERS,** administrator | ) |
| of the estate of **GARRY WAYNE REED,** | ) |
| deceased, | ) |
| | ) Case No. 11-2711-CM |
| Judgment Debtor, | ) |
| | ) |
| v. | ) |
| | ) |
| **AMERICAN STANDARD INSURANCE** | ) |
| **COMPANY OF WISCONSIN,** | ) |
| | ) |
| Garnishee. | ) |

## MEMORANDUM AND ORDER

The case arises out of a double-fatality motor vehicle accident involving cars driven by Bryan Blann and Garry Wayne Reed. At the time of the tragedy, Mr. Reed was insured by American Standard Insurance Company of Wisconsin ("American Standard"). Plaintiff Diane Blann—Mr. Blann's wife—attempted to settle with American Standard after the accident, but eventually took a judgment against Mr. Reed's estate for over $2.5 million. Plaintiff agreed not to execute the judgment against the Reed estate, and the administrator of the Reed estate assigned any rights the estate had against American Standard to plaintiff. Plaintiff now seeks to recover the full judgment from American Standard for negligent or bad faith handling of the insurance claim.

The court conducted a bench trial to determine whether plaintiff can collect the $2.5 million judgment from American Standard. The court has reviewed all of the parties' filings and the evidence,

-1-

including the evidence admitted but not presented in open court. In resolving this issue, the court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## **FINDINGS OF FACT**

### **The Accident**

1. The fatal auto accident occurred about 6:30 a.m. on January 5, 2011.
2. Trooper Kristie Gatlin of the Kansas Highway Patrol prepared a preliminary report on the accident, concluding that Mr. Reed drove his vehicle left of center, striking the Blann vehicle in Mr. Blann's lane of traffic. The collision was nearly head-on. This preliminary report was subject to review by Trooper Gatlin's supervisors.
3. Trooper Gatlin reached her conclusion about Mr. Reed being left of center based on the following information:
    a. An eyewitness, Melma McDonald, gave several inconsistent statements. Specifically:
        i. Ms. McDonald denied that Mr. Blann braked, but there were seventy feet of skid marks from Mr. Blann's vehicle.
        ii. Ms. McDonald claimed that Mr. Blann swerved, but the skid marks did not show swerving.
        iii. Ms. McDonald said that the Blann vehicle was left of center, but the skid marks refuted this claim.
        iv. Ms. McDonald claimed that Mr. Blann may have been on the phone, but the cell phone records showed otherwise.
    b. The data box from Mr. Reed's vehicle showed that he was driving at seventy to seventy-one miles per hour and did not brake.

4. No investigation has revealed a reason for Mr. Blann to have suddenly braked, other than Mr. Reed driving left of center.

5. Mr. Reed got off work about thirty minutes before the accident, after working twelve hours overnight. He still had a magic marker in his right hand after the collision.

6. The final Kansas Highway Patrol report was issued sometime before August 9, 2011, but the court is uncertain of the exact date it was issued. Like Trooper Gatlin's preliminary report, the final report concluded that Mr. Reed crossed the center line and struck the Blann vehicle.

7. Mr. Blann is survived by plaintiff and three children. At the time of the accident, two children still lived at home and one was in college.

8. The Reed estate contained assets totaling between $100,000 and $200,000.

### **The Insurance Claim**

9. American Family Mutual Insurance Company ("AFMIC") insured Mr. Blann. Both AFMIC and American Standard (Mr. Reed's carrier) are in the American Family group of insurance companies.

10. American Standard opened a claim file the same day as the accident. Gregory McCoy was the adjuster assigned to the claim.

11. Opal Evelyn Rogers—Mr. Reed's mother—is the personal representative of his estate. American Standard contacted her and paid for the damage to the Reed vehicle. Because of Ms. Rogers's role as personal representative for the Reed estate, the court refers to Ms. Rogers and the Reed estate interchangeably as "the insured" throughout this Memorandum and Order.

### Inquiries by Plaintiff's Counsel and Settlement Demand

12. Attorney Paul Hasty agreed to write some letters to American Standard on plaintiff's behalf without charge. Mr. Hasty wrote a series of letters to the American Family insurance group shortly after the accident:

    a. <u>January 31, 2011</u>: a letter regarding the wrongful death claim of Mr. Blann, enclosing the preliminary Highway Patrol report that showed Mr. Reed at fault;

    b. <u>February 14, 2011</u>: a follow-up letter (also enclosing the first letter) stating that the insurance company could probably settle the claim by paying Mr. Reed's policy limit; and

    c. <u>February 22, 2011</u>: a third letter, again enclosing the first letter, and inviting American Standard to inspect the Blann vehicle before plaintiff disposed of it.

13. American Standard first responded to these letters on March 1, 2011. In that written response, American Standard represented that Mr. Reed's liability insurance limit was $50,000, but did not offer to pay that limit.

14. On March 7, 2011, Mr. Hasty responded with an offer to settle the claim for $50,000. The offer's deadline was 5:00 p.m. on March 31, 2011.

### American Standard's Investigation

15. At the time of the accident, American Standard did not go to the scene. The company did, however, have an investigator look at the vehicles after they had been towed.

16. Thomas Whitmer was a claim manager for American Standard with twenty years of experience. He testified at trial that he was not qualified to look at the accident scene photographs and determine the location of vehicles and cause of the accident.

17. On February 23, 2011, Mr. Whitmer reassigned plaintiff's claim from Mr. McCoy to Alicia Traffas because he believed it was too complicated for Mr. McCoy.

18. At the time of reassignment, Mr. Whitmer set a liability reserve of $50,000.

19. When assigning the file to Ms. Traffas, Mr. Whitmer told her that it appeared Mr. Reed was at fault—absent a mechanical or medical problem. He asked her to investigate both possibilities. Ms. Traffas investigated neither.

20. Instead, Ms. Traffas reviewed the scene photographs from the Kansas Highway Patrol and interviewed Ms. McDonald. Based on this investigation, Ms. Traffas disagreed with Trooper Gatlin's determination that Mr. Reed was at fault. She decided that Mr. Blann was at fault.

21. Although Ms. Traffas had five years of experience in evaluating accidents, she did not have formal training in accident investigation or reconstruction.

22. On March 9, 2011, Ms. Traffas decided that the claim should be denied. She drafted a denial letter. Mr. Whitmer asked her to first verify that the Kansas Highway Patrol was going to change its report before denying the claim.

23. On March 30, 2011, Ms. Traffas talked with Trooper Gatlin, who told her that she did not intend to change the report. Trooper Gatlin explained her reasons to Ms. Traffas, which were generally the same as those contained in the court's Finding of Fact No. 3.

24. The next day—March 31, 2011—American Standard notified Mr. Hasty that it would not settle at that point, but that American Standard would be in touch once the final Kansas Highway Patrol report was completed. Mr. Traffas did not tell Mr. Hasty about the conversation with Trooper Gatlin. Moreover, neither Ms. Traffas nor anyone else at American Standard ever followed through with her commitment to be in touch after receiving the final report.

25. Ms. Traffas did not investigate plaintiff's damages (other than the fact that Mr. Blann died). She did not investigate the length of his marriage, the number or ages of his children, his employment or income, or his health.

26. While Ms. Traffas handled the claim, American Standard did not assess the risk of loss or damage level. American Standard did, however, know that the exposure was over $1,000,000.

### American Standard's Lack of Communication with the Insured Before April 2011

27. American Standard failed to notify the insured of the February 14, 2011 letter indicating that the claim could probably be settled for the policy limits.

28. American Standard also failed to notify the insured of the March 7, 2011 settlement offer for $50,000.

29. American Standard did not inform the insured that Mr. Whitmer set a $50,000 liability reserve on the claim.

30. American Standard did not tell the insured that the liability claim exceeded the policy's coverage.

31. American Standard also did not give the insured an analysis of liability, risk of loss, or damages.

### The Wrongful Death Suit

32. On April 1, 2011, plaintiff retained Mr. Hasty as counsel and filed suit. She sent a copy of the petition to Ms. Traffas, who reiterated that she would be in touch after receiving the final Highway Patrol report. Plaintiff also made a settlement demand of $2,000,000.

33. When plaintiff filed suit, American Standard transferred the claim file from Ms. Traffas to the legal department (consistent with company procedure). Russell Peterson, an attorney, became the file handler and retained Hal Pierce as counsel for the Reed estate.

34. After reviewing the American Standard file, Mr. Pierce felt that it was a defensible case. He thought it was possible that Mr. Blann crossed the center line and caused the accident.

35. Mr. Pierce was not alone in his assessment. Lee Tetwiler was the attorney for the Reed estate in probate court. Mr. Tetwiler also believed that Mr. Blann caused the accident and made a wrongful death claim against Mr. Blann (and his insurance, AFMIC) on behalf of Ms. Rogers and the Reed estate. AFMIC settled that claim.

36. When Mr. Peterson received the file, he realized that the adjusters had failed to take the following actions:

    a. timely communicate with plaintiff;

    b. respond to written communications;

    c. communicate with the insured about analysis and evaluation;

    d. communicate a policy limit demand;

    e. communicate adverse information from the conversation with Trooper Gatlin; and

    f. communicate a demand to settle for $2,000,000.

37. Mr. Peterson, however, thought it was too late to remedy these omissions, and he did not try to do so.

38. In a letter dated May 16, 2011, American Standard informed the insured that the policy's coverage limit was $50,000, and that if damages exceeded that limit, the insured may be liable for the excess.

39. Mr. Peterson learned that plaintiff claimed $3,000,000 in damages in the lawsuit. He communicated this information to the insured in a letter dated May 17, 2011.

40. The May 17 letter was the last time that Mr. Peterson communicated with the insured. He relied on Mr. Pierce to communicate with the Reed estate, instead.

41. American Standard did not request or review the following discovery in the lawsuit:

    a. photographs of the accident scene taken during daylight, the same day as the accident; and

    b. plaintiff's expert witness report regarding damages.

42. American Standard's only evaluation of damages during the lawsuit was to note that they would exceed $1,000,000.

43. American Standard never obtained an accident reconstruction report during the pendency of the lawsuit, although it did eventually request one.

44. Mr. Peterson decided that if plaintiff made another offer to settle for policy limits, American Standard would accept the offer. But he did not initiate an offer.

### **Settlement of the Wrongful Death Suit**

45. In June 2011, plaintiff offered the Reed estate a settlement agreement under which plaintiff would:

    a. waive a jury trial;

    b. present evidence to the court ex parte on liability and damages;

    c. accept judgment—favorable or unfavorable;

    d. seek to recover judgment from American Standard; and

    e. release all claims against the Reed estate.

46. Mr. Pierce told Ms. Rogers that if she signed the agreement, there would likely be no coverage.

47. American Standard, however, took no position on whether Ms. Rogers should enter into the settlement agreement and did not communicate with her about it. Specifically, American Standard did not inform Ms. Rogers that entering the agreement would be considered a violation of her contractual duty to cooperate with American Standard. As American Standard

points out, the May 16 letter from American Standard advised Ms. Rogers that her cooperation in the lawsuit was essential. But the letter discussed "cooperation" in terms of notifying Mr. Pierce of any changes in contact information or of plans to be out of town—not in relationship to settlement agreements.

48. Ms. Rogers did not want to settle because she did not believe that her son caused the accident. She made it clear to her attorneys (Mr. Pierce and Mr. Tetwiler) that she did not intend to sign the agreement.

49. In October 2011, Mr. Hasty sought to have Ms. Rogers removed as personal representative of the Reed estate because she wanted to use the real estate and dispose of personal property. The probate court judge overruled the motion, but advised Ms. Rogers that he thought she should accept plaintiff's settlement agreement.

50. In November 2011, plaintiff reoffered the settlement with American Standard's knowledge, but American Standard again did not communicate with Ms. Rogers about it.

51. Although Ms. Rogers had previously indicated to Mr. Tetwiler and Mr. Pierce that she would not sign the agreement, she did sign the agreement this time.

52. Without notice to Ms. Rogers's counsel, plaintiff presented evidence to the district court ex parte.

53. Plaintiff offered as evidence the police reports, Trooper Gatlin's observations and diagram, photographs, and witness reports (including Ms. McDonald's statements).

54. The district court found Mr. Reed 100% at fault and assessed damages at $2,536,676.28 plus costs. The court entered judgment on November 14, 2011.

55. Mr. Pierce did not learn of the agreement until Mr. Tetwiler sent him a copy of the document. Mr. Tetwiler sent it on November 11, but Mr. Pierce did not receive it until 4:22 p.m. on

November 14—after judgment was entered. Mr. Pierce notified American Standard of the agreement the next day, but did not yet know about the judgment.

56. Mr. Pierce learned of the judgment in a letter from Mr. Hasty dated November 15, 2011.

57. American Standard has not paid the judgment or costs.

## **American Standard's Policies and Procedures**

58. American Standard requires its adjusters to comply with the following claim guidelines:

    a. Attempt to contact the insured and other necessary parties the same day the claim is received;

    b. Make a reasonable effort to contact by phone and document the contact in the file;

    c. Inform the insured of the claim process early in the life of the claim;

    d. Investigate liability/cause of loss;

    e. Investigate, establish, and document the extent of injuries/damages;

    f. Inform the insured of significant changes in timing or process;

    g. Use provided forms and templates for Casualty Investigation Reports and High Damage Review Forms;

    h. Inform the insured by letter if the claim may well exceed policy limits;

    i. Complete initial reports within forty-five days of claim assignment; and

    j. Answer correspondence within ten days.

59. American Standard complied with only one of the guidelines identified above: It investigated liability.

## **CONCLUSIONS OF LAW**

## **Breaches by American Standard**

1. <u>Overriding Duties to Act in Good Faith and without Negligence</u>.  Under Kansas law, an insurer owes its insured duties to act in good faith and without negligence.  *Glenn v. Fleming*, 799 P.2d 79, 85 (Kan. 1990); *Bollinger v. Nuss*, 449 P.2d 502, 508 (Kan. 1969); *see also Covill v. Phillips*, 452 F. Supp. 224, 226 (D. Kan. 1978).  If an insurer breaches either of these duties when defending and settling claims against its insured, it may become liable for amounts exceeding its policy limits.  *Glenn*, 700 P.2d at 85; *Bollinger*, 449 P.2d at 508.  Plaintiff claims that American Standard violated these obligations to its insured by breaching a number of specific duties falling under this good faith/negligence umbrella: (1) duty to investigate; (2) duty to evaluate and consider the interests of the insured; (3) duty to communicate; and (4) duty to negotiate settlement.  The court will examine each of these specific duties in turn.

2. <u>Duty to Investigate</u>.  In deciding whether to settle, an insurance company must use ordinary care in its investigation.  *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 652 P.2d 665, 668 (Kan. 1982) (quoting *Bollinger*, 449 P.2d at 510); *see also Watson v. Jones*, 610 P.2d 619, 626 (Kan. 1980); *Brown v. Cont'l Cas. Co.*, 498 P.2d 26, 33 (Kan. 1972).  The insurance company must act with adequate information.  *See Covill*, 452 F. Supp. at 226.  If the insurer fails to conduct a timely and good faith investigation, it is negligent.  *Hawkins v. Dennis*, 905 P.2d 678, 690 (Kan. 1995).  Here, American Standard failed to use ordinary care in its investigation after receiving plaintiff's first settlement offer.  Specifically, in Ms. Traffas's initial investigation, she:

    a. quickly came to the conclusion that the Kansas Highway Patrol was wrong despite her limited resources and experience;

    b. relied on inconsistent eyewitness testimony in her determination;

    c. failed to investigate the possibilities that Mr. Reed had a medical or mechanical problem despite being instructed to do so;

    d. failed to reevaluate her own conclusions and let the policy-limits offer expire even though Trooper Gatlin advised her that the report would not be changed; and

    e. considered only whether the insured was at fault, failing to look at any other relevant information—such as Mr. Blann's background or potential damages.

3. The court concludes that Ms. Traffas did not use ordinary care in her investigation. She did not act with adequate information and ignored information that would contradict her conclusion. In short, she treated the claim as if it had little value, instead of considering the claim as if there were no policy limits. *Cf. Coleman v. Holecek*, 542 F.2d 532, 537 (10th Cir. 1976) ("[T]he claim should be evaluated by the insurer without looking to the policy limits and as though it alone would be responsible for the payment of any judgment rendered on the claim."). As explained in more detail below, this constitutes negligent consideration of the claim—if not bad faith.

4. <u>Duty to Evaluate and Consider the Interests of the Insured</u>. Insurance companies also have a duty to "honestly evaluate the value of an unlitigated claim based on its apparent merits or lack thereof, the possibility of liability being established, and the probable nature and extent of [the] injuries to be proved." *Covill*, 452 F. Supp. at 226 (citing *Bollinger*, 449 P.2d at 513). American Standard also breached this duty. It never evaluated the merits of the claim relative to plaintiff's possible recovery. Although American Standard eventually acknowledged that plaintiff's claim was worth more than $1,000,000, it never fully analyzed plaintiff's damages. American Standard did not know how much the Reed estate risked by going to trial. Without such evaluation, American Standard could not give equal consideration to its insured's position.

*See Rider v. State Farm Mut. Auto. Ins. Co.*, 514 F.2d 780, 785 (10th Cir. 1975); *see also Levier v. Koppenheffer*, 879 P.2d 40, 46 (Kan. Ct. App. 1994) ("[A] claim for damages in excess of policy limits creates a duty on the part of the insurer to consider the interests of the insured as equal to its own." (citation omitted)).

5. <u>Duty to Communicate with the Insured</u>. Another requirement of good faith is communication. The insurer must communicate to its insured "the results of any investigation indicating liability in excess of policy limits and any offers of settlement which have been made . . . ." *Covill*, 452 F. Supp. at 226 (citing *Bollinger*, 449 P.2d at 512); *Levier*, 879 P.2d at 46 (citations omitted). American Standard breached this duty on numerous occasions. Most significantly, it failed to notify its insured of the offer to settle for $50,000. One court has referred to an insurer's failure to notify its insured of a within-policy-limits offer to settle as a "gross and unpardonable act." *Smith v. Blackwell*, 791 P.2d 1343, 1349 (Kan. Ct. App. 1989); *see also Levier*, 879 P.2d at 46–47. And American Standard was not legally permitted to rely on Ms. Rogers's attorneys to communicate with her. The duty to communicate lies with American Standard. *Ins. Co. of N. Am. v. Med. Protective Co.*, 768 F.2d 315, 322 (10th Cir. 1985) ("We are not persuaded by Medical Protective's attempt to exculpate itself from liability by claiming that it reasonably could believe that Blaes—Dr. Torbey's attorney—would keep Dr. Torbey adequately informed of negotiations. The duty to inform was squarely that of Medical Protective."). Here, American Standard representatives neglected to share information with its insured. They did not timely inform Ms. Rogers of:

    a. settlement demands;

    b. analysis and evaluation of the claim against the estate; or

    c. the $50,000 liability reserve or that the claim exceeded this reserve.

6. American Family's repeated failure to communicate with its insured about significant matters constitutes a breach of its duty to defend in good faith and without negligence.

7. <u>Duty to Negotiate</u>. Finally, an insurer must make reasonable efforts to negotiate a settlement of claims against its insured. *Roberts v. Printup*, 422 F.3d 1211, 1216 (10th Cir. 2005); *Smith*, 791 P.2d at 1346 (citation omitted). When an insurer wrongfully fails to settle, it breaches its contractual duty to defend. *Glenn*, 799 P.2d at 90 (citing *Guarantee Abstract & Title Co.*, 652 P.2d at 667). And when an insurer is presented a policy-limits settlement offer, it must evaluate that offer without regard to policy limits. *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 934 P.2d 65, 85 (Kan. 1997); *see Coleman*, 542 F.2d at 537 ("[T]he duty to settle arises if the carrier would initiate settlement negotiations on its own behalf were its potential liability equal to that of the insured."). Again, the insurer must give equal consideration to the insured's interests as its own, *Glenn*, 799 P.2d at 85 (citations omitted), and act in the best interests of the insured, *Spencer v. Aetna Life & Cas. Ins. Co.*, 611 P.2d 149, 154 (Kan. 1980); *see also Levier*, 879 P.2d at 47 ("An ordinarily prudent person would not reject a $100,000 settlement offer to face liability in excess of $2 million. Instead of protecting [the insured's] best interests, [the insurance carrier] acted with indifference toward its insured's ultimate financial liability.").

8. <u>*Bollinger* Factors</u>. The Kansas Supreme Court has identified eight factors for courts to apply in evaluating whether an insurer breached its duty of good faith in settlement negotiations. *Bollinger*, 449 P.2d at 512.

   a. <u>Strength of the case for liability and damages</u>: In this case, there was some question of liability. But with the Kansas Highway Patrol's preliminary determination of fault, the case for fault on the part of Mr. Reed was arguably stronger than the case for Mr. Blann

being at fault. And there is no legitimate question whether damages in this case would be significant. Mr. Blann had a wife, three children, and a job. This is not a case where his injuries were suspect or uncertain. Mr. Blann lost his life as a result of the accident. This factor weighs against American Standard.

b. <u>Attempts by insurer to get the insured to contribute to settlement</u>: This factor does not apply here.

c. <u>Failure to properly investigate</u>: The court discussed American Standard's failings in this area above. This factor weighs heavily in favor of finding American Standard negligent.

d. <u>The insurer's rejection of advice by its own attorney</u>: There is no evidence regarding this factor.

e. <u>Failure to inform insured of a compromise offer</u>: Again, the court noted American Standard's failure to inform its insured of either offer. The court is uncertain why this occurred, but this factor weighs heavily in favor of finding American Standard negligent.

f. <u>Financial risk at stake</u>: Here, American Standard had $50,000 at stake. The insured had over $2.5 million at stake. The insured also had $100,000 to $200,000 in assets, which were jeopardized because of American Standard's conduct.

g. <u>Fault of the insured</u>: There is no evidence suggesting that the insured bears any fault for American Standard's actions in this case.

h. <u>Other factors bearing on bad faith</u>: The court notes that American Standard failed to follow its own policies regarding communication with its insured. Ms. Traffas failed to follow the direction of her supervisor, and although Mr. Peterson recognized that

American Standard had made several errors, he took no measures to correct those

errors.

9. After considering the *Bollinger* factors, the court concludes that American Standard was—at a minimum—negligent in its settlement negotiations (or lack thereof).

**Excusal of Performance by Insured**

10. American Family claims that it is not responsible for any excess judgment because its insured breached the duty of cooperation under the contract. Plaintiff contends that the insured was relieved of the duty to cooperate because American Standard first breached the contract in the numerous ways identified above.

11. One party's material breach of contract can relieve another party of its obligations under the contract. *Lassiter v. Topeka Unified Sch. Dist. No. 501*, 347 F. Supp. 2d 1033, 1041 (D. Kan. 2014) ("A party's uncured material breach of a contract can suspend or discharge the other party's obligation to perform." (citations omitted)). This general rule of contract law is applied regularly when an insurer wrongfully denies coverage under an insurance contract. *See, e.g., First Hays Banshares, Inc. v. Kan. Bankers Sur. Co.*, 769 P.2d 1184, 1189 (Kan. 1989); *see also Youell v. Grimes*, 217 F. Supp. 2d 1167, 1175 (D. Kan. 2002). It is not as clear whether the general rule also applies when an insurer does not deny coverage, but instead breaches the contract in other ways. *See Kannaday v. Ball*, No. 09-2255-JWL, 2010 WL 2346368, at *10 n.3 (D. Kan. June 9, 2010) (citing *Youell*, 217 F. Supp. 2d at 1175–76). Indeed, the court has found no Kansas law excusing performance under these precise circumstances.

12. This case presents a model example of when the general law on excusal of performance should apply. Accordingly, the court concludes that the quantity and materiality of the breaches

described above relieved the insured of its obligations under the contract. This specifically includes the duty to cooperate.

13. While American Standard did not overtly deny all coverage (and, in fact, set a reserve of $50,000), American Standard's failure to communicate with its insured was such that the insured did not know the status of coverage, settlement offers, or the investigation. Ms. Rogers was unaware that American Standard could have avoided years of litigation by giving weight to Trooper Gatlin's analysis and accepting plaintiff's $50,000 offer on or before March 31, 2011.

14. Under these circumstances, Ms. Rogers was not required to continue cooperating with American Standard after the insurer repeatedly and blatantly failed to give consideration to the Reed estate's position. American Standard sought only to minimize its own loss—not to protect the interests of its insured. The severity and impact of its breaches were such that they excused performance by the insured.

### **Alleged Collusion**

15. American Standard also contends that it should not be liable for any excess judgment because the agreement between plaintiff and Ms. Rogers was collusive.

16. "A nonjury verdict judgment may be enforced against an insurer contingent upon proving bad faith or negligence in a refusal to settle. The assignment/covenant not to sue may be utilized if the judgment is reasonable in amount and entered into in good faith." *Glenn*, 799 P.2d at 93. The key inquiry is whether the settlement amount is reasonable. *Associated Wholesale Grocers, Inc.*, 934 P.2d at 87 (identifying factors that might be used in assessing reasonableness).

17. The court concludes that the agreement between Ms. Rogers and plaintiff was not collusive. They agreed for a trier of fact to determine both liability and damages. And plaintiff agreed to

be bound by the judgment of the court—whatever it was. Although the hearing was conducted ex parte, an independent factfinder made the decision on liability and damages. Both findings are supported by the record. The liability determination is supported by the Highway Patrol's final report, and the damages are supported by the John Ward Economics report and the record of the November 14, 2011 hearing. In fact, the judge did not award all of the damages sought by plaintiff.

18. Given these considerations, the court determines that the agreement between plaintiff and Ms. Rogers was reasonable and resulted in a reasonable verdict by the court.

### Causation

19. Finally, the court considers the issue of causation. American Standard claims that its actions did not cause the judgment against the Reed estate; rather, it was Ms. Rogers's own actions (i.e., entering into the agreement with plaintiff) that resulted in the liability to the Reed estate. American Standard raised this issue at the close of evidence in a motion for judgment as a matter of law. The court took that motion under advisement after trial, and now denies the motion implicitly, as the court issues its ruling on the causation issue.

20. This court was faced with a similar question in *Roberts v. Printup*, No. 02-2333-CM, 2008 WL 2725807 (D. Kan. July 10, 2008). The undersigned found that it was the plaintiff's own conduct—not the negligent treatment of her claim by the insurer—that ultimately caused the plaintiff's damages. *Roberts*, 2008 WL 2725807, at *8. On appeal, the Tenth Circuit disagreed with this court's application of *Wade v. EMASCO Ins. Co.*, 483 F.3d 657 (10th Cir. 2007), on the causation issue. *Roberts v. Printup*, 595 F.3d 1181, 1189 (10th Cir. 2010). The appellate court reversed. *Id.* at 1191. In *Roberts*, the Tenth Circuit discussed the law on causation and when an intervening act will break a causal connection, holding that "[i]t is readily apparent

that it was foreseeable to Shelter that its negligence in failing to implement a system to handle reasonable time-sensitive settlement offers from an injured party could result in a lawsuit being filed against its insured." *Id.* Distinguishing *Wade*, the court said, "Unlike in *Wade*, in this case Shelter provided no evidence raising any concern that Ms. Roberts imposed an arbitrary deadline or that she provided insufficient information to Shelter for it to make a fair appraisal of the case." *Id.*

21. Likewise, in this case, plaintiff did not withhold information from American Standard. Plaintiff gave a relatively short deadline to accept her offer, but the deadline was not so short as to deprive American Standard of sufficient time to adequately investigate the case. And once plaintiff filed suit, she became obligated to pay her attorney, which changed her circumstances. *See id.* ("[Ms. Roberts] became obligated to pay a portion of her recovery to her attorney once the lawsuit was filed. These events caused a change in Ms. Roberts' circumstances as a direct result of Shelter's negligence, unlike the situation in *Wade*.").

22. The court concludes that Ms. Rogers's act of entering into the settlement agreement and proceeding to trial without American Standard was not an intervening act that broke the causal connection between American Standard's negligence and the judgment against the Reed estate. Ms. Rogers's decision to enter into the agreement was reasonably foreseeable based on American Standard's repeated failure to provide her with information. She was unaware of the company's assessment of her case or its position on whether she should enter into the agreement. She knew only that all of the assets in her son's estate were at risk and that she was tired of litigation. For these reasons, the court determines that Ms. Rogers did not break the causal connection between American Standard's negligent or bad faith actions and the entry of judgment against the Reed estate.

**Conclusion**

23. For the above-stated reasons, the court concludes that American Standard breached its duties to its insured. American Standard is therefore liable for the wrongful death judgment in the amount of $2,536,676.28. This amount was fixed and certain on the date of the judgment: November 14, 2011. Kansas law also provides for prejudgment interest at the rate of 10% per annum. Kan. Stat. Ann. § 16-201.

24. Kansas law—specifically, Kan. Stat. Ann. § 40-908—requires the court to allow plaintiff a reasonable sum as attorney's fees because the policy insures against fire, tornado, lightning, or hail. *Bussman v. Safeco Ins. Co. of Am.*, 317 P.3d 70, 89 (Kan. 2014); *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 137 P.3d 486, 496–97 (Kan. 2006); *Hamilton v. State Farm Fire & Cas. Co.*, 953 P.2d 1027, 1032 (Kan. 1998). It is immaterial that the actual loss here did not occur by one of those causes. *Bussman*, 317 P.3d at 89; *Lee Builders, Inc.*, 137 P.3d at 497; *Hamilton*, 953 P.3d at 1032. The court therefore will award reasonable attorney's fees in this action. Plaintiff is directed to comply with D. Kan. R. 54.1 in submitting this request.

**IT IS THEREFORE ORDERED** that the court finds in favor of plaintiff and against American Standard. The Clerk of Court is directed to enter judgment in favor of plaintiff and against American Standard in the amount of $2,536,676.28 plus prejudgment interest.

Dated this 19th day of May 2014, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**